UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

CHRISTIAN McDONALD,

                      Plaintiff,

      v.

BARRY JAY REISS ESQ., STEVEN J. BROWN,
REMNANTS PRODUCTIONS LLC, CINE GLOBE
PRODUCTIONS LLC, EAST LAKE FILMS LLC
and THOMAS V. CONIGLIARO,

                      Defendants.

----------------------------------------------------------------x

Civil Action No. 12 cv 7109 (WHP)

**FIRST AMENDED COMPLAINT**

**with**

**JURY DEMAND**

**ECF CASE**

       Plaintiff Christian McDonald, through his attorney, Lisa Ornest, for his First Amended Complaint against Barry Jay Reiss, Esq., Steven J. Brown, Remnants Productions LLC, Cine Globe Productions LLC, East Lake Films, LLC, and Thomas Conigliaro, respectfully states and alleges as follows:

<u>**NATURE OF ACTION**</u>

      1.     This is a civil action for damages and equitable relief arising from violations of the Federal Copyright Act, breach of contract, breach of implied contract, breach of fiduciary duty, fraud, attorney negligence, conversion, *quantum meruit* and unjust enrichment.

<u>**THE PARTIES**</u>

      2.     Plaintiff Christian McDonald ("Plaintiff" or "Mr. McDonald") is a writer residing in New York, New York at the time of the events alleged hereto and who currently resides in the State of Missouri.

3.      Defendant Barry Jay Reiss, Esq. ("Defendant Reiss") is a New York attorney with an office at 5 Penn Plaza, 19th Floor, New York, New York 10001.

4.      Defendant Steven J. Brown ("Defendant Brown") is an individual residing at Turnberry Towers, 2747 Paradise Road, Condominium #106, Las Vegas, Nevada 89109, upon information and belief.

5.      Defendant Remnants Productions LLC ("RP LLC") is a New York limited liability company whose principal place of business is 5 Penn Plaza, 19th Floor, New York, New York.  Upon information and belief, Defendant Brown is the manager of RP LLC.

6.      Defendant Cine Globe Productions LLC ("Cine Globe") is a New York limited liability company whose principal place of business is 5 Penn Plaza, 36th Floor, New York, New York.  Upon information and belief, Brown is a majority interest holder in Cine Globe, which is a majority interest holder in RP LLC.

7.      Defendant East Lake Films LLC ("East Lake") is a New Jersey LLC whose principal place of business is 107 Beechwood Road, Summit, New Jersey.  Upon information and belief, East Lake Films is the current purported owner/distributor of the Film (discussed below).

8.      Defendant Thomas V. Conigliaro ("Defendant Conigliaro") is an individual who resides in New Jersey at 107 Beechwood Road, Summit, New Jersey, upon information and belief.  Upon information and belief, Conigliaro is the majority interest holder of East Lake and/or the purported owner/distributor of the Film.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1332 (diversity jurisdiction), 1338(a) (federal question), and 1367(a) (supplemental jurisdiction). The amount in controversy exceeds $ 75,000.

10.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and § 1400(a).

11.      Defendants are subject to personal jurisdiction because three of the defendants are New York residents, and the nexus of events and injuries at issue took place in New York.

## FACTS

12.      Plaintiff Christian McDonald is the sole author of an original screenplay entitled "Remnants" (the "Screenplay"), about the survivors of a nuclear holocaust.

13.      McDonald registered the copyright for the Screenplay with the United States Copyright Office (the "2006 Copyright," attached hereto as **Exhibit "A"**) and the Writers Guild of America.

14.      Prior to that, on or about December 2005, McDonald and his then-partner Allison Hull ("Hull"), met with Defendant Reiss in regard to having investor papers drawn up for the Screenplay, in anticipation of financing an independent production with an estimated budget of approximately $300,000.00.

15.      McDonald and Hull paid Reiss a retainer of $5000.

16.      Reiss asked McDonald if he could show the script to a "producer friend and client," to see if the producer would be interested in investing.  This "friend and client" was Defendant Brown.

17.     Shortly thereafter, Reiss informed McDonald that Brown was interested in producing a film from the Screenplay (the "Film").  Reiss told McDonald that Brown already had financing in place and wanted to increase the budget to $1.1 million.

18.     McDonald agreed that Brown could option the Screenplay, with the proviso that McDonald would be permitted to direct, and that his and Hull's production "company," Res Ipsa Loquitur (an unincorporated and unregistered entity) ("Res Ipsa"), would get a co-producer credit.  Reiss assured McDonald that Brown would agree to that.

19.     Reiss directed McDonald and Hull to sign a waiver of conflict of interest, since Reiss already represented Brown.

20.     Over the following months, McDonald met with Reiss several times to discuss the project further.  Throughout 2006, Reiss strung McDonald along by claiming that financing was already in place and was just being held in "escrow."

21.     In or about June of 2006, Reiss claimed that he and Brown had the go-ahead for production, and advised McDonald to sign documents that Reiss claimed would be necessary regardless of whether Brown came through with financing or McDonald got financing on his own.   Reiss told McDonald that the documents were just a "formality" to transfer ownership of the rights in the Screenplay from McDonald to Res Ipsa (the "Res Ipsa Purchase Agreement").

22.     Attached to the Res Ipsa Purchase Agreement was a document that purportedly assigned the 2006 Copyright to Res Ipsa (the "Res Ipsa Copyright Assignment").

23.     Reiss advised McDonald and Hull to sign both of these agreements, but he told McDonald that the documents would not be used and would be "held in escrow."

24.     Reiss also assured McDonald that Brown would honor the option agreements for the Screenplay they had discussed, and that McDonald still owned the Screenplay.

4

25.     In or about August 2006, Reiss and Brown again assured McDonald that financing was "closed and in escrow," and that they would be shooting by the end of that year. Reiss told McDonald that in order for the deal to go through a new entity would have to be formed, Remnants Productions LLC ("RP LLC"), whose members would be Res Ipsa and Brown's production company, Defendant Cine Globe Productions LLC ("CineGlobe").

26.     McDonald told Reiss that his agent/manager would have to see a copy of any operating agreement before he signed.  Reiss told McDonald that the deal would be off if the agent/manager was allowed to read the agreement, and anyway, that it was a moot point, because Hull had already signed the operating agreement (the "RP LLC Agreement").

27.     Thus, Reiss pitted McDonald and Hull against each other.  Upon information and belief, Hull was promised an executive producer credit in exchange for her cooperation.

28.     Under the RP LLC Agreement, Res Ipsa received a minority voting interest in RP LLC, and Cine Globe, Brown's entity, received a majority interest.  In addition, while all members of the RP LLC would be entitled to vote on all matters, a majority vote, based upon percentage ownership, would be required for any action, and therefore Cine Globe (and thus, Brown), controlled the entire power of RP LLC.

29.     Brown was also designated manager of RP LLC.

30.     Moreover, while the RP LLC Agreement lists the capital contributions of Res Ipsa and Cine Globe each to be a nominal ten dollars ($10), the fact is that Res Ipsa's capital "contribution" consisted of the Screenplay.  Thus Res Ipsa's contribution was much greater than $10, was in fact the entire assets of RP LLC.

31.     The RP LLC Agreement further provided that McDonald would perform the services of writer and director of the Film in accordance with certain "attached" production agreements.  However, those agreements were not attached and never materialized.

32.     Thus, there was never any real consideration for McDonald's fraudulently induced surrender of the Screenplay.

33.     Instead, there are several versions of a purported assignment of the 2006 Copyright from Res Ipsa to RP LLC (the "RP LLC Assignment").

34.     Reiss told McDonald that the RP LLC Assignment was just a rider to the RP LLC Agreement, nothing to worry about, that neither he nor Brown had done any copyright filings, and, once again, that McDonald still owned the script.

35.     Of all the documents Reiss induced McDonald to sign, and those to which McDonald was (purportedly) detrimentally subject even though he did not sign (like the RP LLC Agreement, in which all of McDonald's rights in Res Ipsa and the Screenplay and the 2006 Copyright were transferred to a company in which McDonald had only a minority voting interest), there is no executed document that memorializes any compensation and/or credit agreements or any other form of consideration to McDonald for the option on the Screenplay or the purchase of the Screenplay or the 2006 Copyright, or for McDonald's work as director on the Film or for Res Ipsa's co-producer credit.

36.     Nevertheless, Reiss kept assuring McDonald that Reiss had put protections in place to make sure that McDonald would be both Director and Co-Producer of the Film, that even though Brown was a client of Reiss's McDonald was also a client, and that McDonald should have no reason to fear that he wasn't being protected.

6

37.     However, the fact is that in addition to failing to provide for McDonald's advance and contingent compensation and credits for the Screenplay or for his work as director, or as co-producer, the RP LLC Agreement contained no guarantee that McDonald could not simply be stripped of his property and his rights with no compensation and no credit whatsoever.

38.     And that is exactly what eventually happened.

39.     Meanwhile, over the next two years, both Reiss and Brown continued to assure McDonald that financing was complete, that production would start soon, that McDonald remained sole owner of the Screenplay, that no copyright claims had been filed, and that all the required production contracts were being held in "escrow."

40.     During this time, as a result of these assurances, McDonald turned down other employment opportunities and spent thousands of his own money on development costs.

41.     By 2008, despite Reiss's and Brown's promises of specific start dates (and places, which depended on the tax credits that would be available for shooting in a particular venue, an issue with which both Reiss and Brown were concerned), production had still not moved forward, and McDonald and his manager began pushing for a release of any claims Brown/Cine Globe/RP LLC had over the Screenplay.  In or about both April and August of 2008, both Reiss and Brown promised McDonald's manager that a signed release of the option would be provided.  McDonald's manager even met with Reiss in Los Angeles on the basis of a representation by Reiss that Cine Globe would provide a release of any rights in the screenplay.

42.     Both Reiss and Brown acknowledged that an option agreement was in place, and that the Screenplay still belonged to McDonald.  A release was never provided.

43.     Upon information and belief, Reiss offered McDonald's manager a producer credit instead.

7

44.    McDonald continually reminded Reiss and Brown that the script option would expire in December 2008, and Reiss and Brown continually acquiesced.  McDonald then agreed to a three-month extension to March, with an automatic release.

45.    By March 2009, production still had not begun.  However, when McDonald demanded return of the Screenplay pursuant to the verbal option agreement and automatic release to which Brown and Reiss had agreed, Reiss and Brown continued to refuse to provide the release.  They would not even discuss it.  They kept saying, "just one more week."  McDonald realized that Reiss and Brown had no intention of honoring the verbal option agreement.

46.    Toward June of 2009, Reiss also promised McDonald, more than once, that he would draft a new set of "clean" contracts, including a director's agreement, and also including a new d/b/a entity for ownership of the Screenplay and Copyright (instead of Res Ipsa), because Hull was no longer partners with McDonald, and McDonald wanted to use a new name.  Thus, in the summer of 2009, Reiss, McDonald's attorney, was continuing to assure McDonald that McDonald still owned the screenplay.

47.    However, none of these "clean" contracts ever materialized.

48.    Finally, pre-production appeared to have begun.  In or about November 2009, Brown sent McDonald to New Orleans to begin work on the film as writer, director and co-producer.  Immediately upon his arrival, however, McDonald was treated with hostility and discriminatory behavior by Defendant Brown's production team, especially one Zachary Reeves ("Reeves"), who screamed at McDonald, calling him a "fucking faggot," among other things.

8

49.     Brown, who did not himself appear in New Orleans, apologized over the phone to McDonald, who began performing his duties, including casting, the scouting of exterior locations, construction of the soundstage, etc.

50.     Things appeared to be going well and progressing on schedule.  McDonald designed a set that looked exactly like his parent's basement, and it was constructed (and, upon information and belief, it currently appears in scenes from the Film).

51.     Brown also asked McDonald to produce a multi-page plot synopsis and director's statement for the American Film Institute Market, which McDonald did.

52.     Nevertheless, right from the start, McDonald  heard rumors from the crew about casting and budget difficulties. He was told of failures to receive pay and severe budget restrictions.  The production company did not seem serious and professional; they had failed to obtain proper rights clearances.  Crew members believed it possible that money was being misappropriated and being used to pay for expenses on a film shot several months prior, because the available budget seemed to be about one-fifth of the supposed $1.1 million dollars Brown had promised.  These rumors deepened McDonald's fear that, despite Reiss's and Brown's assurances, the budget had not been raised.

53.     The production crew, about eight people who appeared to have no real duties, stayed in their "office" bickering and refused to hold production meetings.

54.     McDonald was able to get a very well known Director of Photography to work on the Film, but when the DP came, the production crew mocked him and McDonald for being "too passionate" about the Film.  McDonald and the DP were met with nothing but resistance from the production crew, who did not seem to have any interest in getting the Film made and turned every small issue into an obstacle.

9

55.     Consistent with the rumors circulating among the other crew members, the DP told McDonald that the budget for the camera and lighting crew appeared to be more in line with a $200,000 production, not a $1.1 million production.  Even the make up and special effects people complained to McDonald about budget and salary cuts (in a movie about the horrors of nuclear holocaust).

56.     Cast rehearsals got cancelled.

57.     Although he was the manager of RP LLC, the production company for the Film, of which McDonald was a member, and thus owed McDonald a fiduciary duty, and although McDonald was also the director and co-producer of the Film, as well as writer of the Screenplay, Brown continually refused to give McDonald any budget information or documentation.

58.     Then, just before Christmas 2009, Defendant Conigliaro decided to bring in his own director, someone he had worked with before, Peter Engert ("Engert").  Brown (over the phone) gave McDonald an ultimatum: either quit the production, or stay and serve as co-director with Engert.  McDonald said that he would stay and co-direct, although he believed that Brown's real intention was to get him to abandon the production and leave New Orleans, especially since one of the members of the production crew, Oak Porcelli ("Porcelli"), had already told McDonald's landlady that McDonald would no longer be needing the apartment.

59.     Upon information and belief, Engert was recruited upon Conigliaro's discovery (through not-so-subtle interrogations of McDonald by the production crew) that McDonald did not share Conigliaro's political beliefs in regard to U.S. nuclear arms policy.

60.     When McDonald tried to work with Engert, Engert and Porcelli screamed at McDonald that McDonald was an assistant director in name only, and that he should mind his own business and not attempt to participate.

10

61.     At a loss, McDonald called Reiss, who feigned ignorance of any problems. McDonald reminded Reiss that he was still sole owner of the Screenplay, and Reiss agreed that was true.  Reiss promised to speak to Brown and to call McDonald back, but he never did.  In fact, that conversation in late December 2009 was the last time McDonald actually spoke to Reiss.

62.     McDonald wanted to leave New Orleans for the holidays and then return for the December 28 principal photography start date (an odd choice of start date but a convenience to Defendant Conigliaro's daughter, who had a small role in the Film), but a member of the production company told McDonald he had to give up the apartment, and implied that if McDonald left his cat there (for three days) it might not be safe.  So McDonald took his cat and flew home to his family.

63.     It was also around this time, December/January 2009/2010, that McDonald learned for the first time that Brown and Reiss had in fact filed a copyright claim on the Screenplay, all the time they were assuring him that the Screenplay and the Copyright still belonged to him.

64.     After the holidays, McDonald returned to New York and continued to email Reiss, who continued to feign ignorance and surprise, and suggested, for the first time, that maybe McDonald should not be treating him as his attorney anymore.

65.     And it wasn't even until he got back to New York that McDonald found out that the named actors that had been promised by Reiss and Brown would not be appearing in the Film.

66.     At some point, principal photography finished, without McDonald's participation, and scenes from the Film appeared on the internet, with another writer credited, not McDonald.

11

When McDonald saw this, he called Reiss and told him to have the scenes taken down, and the scenes were taken down.

67.    Then, on or about April, 2011, Defendant Conigliaro, one of the investors in the Film, brought a lawsuit against Brown, RP LLC, Reeves, Porcelli and others (although not Reiss, who never represented Conigliaro) (the "Conigliaro Supreme Defendants"). *Conigliaro v. Brown, et al.*, Index No. 651057/2011 (the "Conigliaro Complaint").

68.    The Conigliaro Compliant claimed, among other things, that the Conigliaro Supreme Defendants (a) fraudulently induced Conigliaro and others to invest in the Film, (b) mismanaged production funds, and (c) converted certain tax credit money received by them from the State of Louisiana.

69.    The Conigliaro Complaint further claimed that the Conigliaro Supreme Defendants used the Screenplay and the Film, basically, as an excuse to obtain and transfer tax credits and investor funds under false pretenses, and that they never had any real interest in releasing the Film to begin with.

70.    This case never even reached a preliminary conference. As part of his motion for a default judgment, Conigliaro annexed a copy of the budget submitted by the Conigliaro Supreme Defendants (signed by Porcelli and Reeves on behalf of Cine Globe) to the State of Louisiana to demonstrate qualification for the over $400,000.00 in tax credits they eventually received.

71.    This budget claims total expenses of $1,711,083.00.

72.    Specifically, it claims $175,000 in writer/script development costs (although this amount was never paid to McDonald, the only writer on the Screenplay).

73.     It further claims $90,000 in director's salaries (also not paid to McDonald, even though he was director on the Film up until three days before principal photography).

74.     On the basis of these, and other, alleged expenses, the Conigliaro Supreme Defendants received their tax credit check from the State of Louisiana for over $440,000.00.

75.     Nevertheless, in their security agreement with the Screen Actor's Guild (SAG), the Conigliaro Supreme Defendants presented a budget for the Film of $625,000.  Upon information and belief, they did this in order to qualify for the SAG low budget independent film agreement, which permits a lower rate of pay for the actors provided that the total budget of the picture is under $625,000.

76.     The Conigliaro Complaint was settled by stipulation of the parties on or about June 2011 (the "Conigliaro Stipulation," attached hereto as **Exhibit "B"**) (the "Conigliaro Settlement").  In the "whereas" clauses, the Conigliaro Stipulation recites that there were copyright disputes.  In the substantive provisions of the Conigliaro Stipulation, the Conigliaro Supreme Defendants purportedly transferred the Film and the Screenplay to Defendant Conigliaro.  The Conigliaro Stipulation also contains certain provisos as to payment to the actors, but it makes no provision for consideration to Mr. McDonald or any agreement as to compensation, either advance or contingent, or print or screen credit, either for the Screenplay or for McDonald's work as director, or for a co-producer credit.

77.     Pursuant to the RP LLC Agreement, McDonald was entitled to a 49% interest in RP LLC.  Therefore, in addition to everything else, he is entitled to 49% of the value of the Conigliaro Settlement, believed to be at least $1,000,000 in its entirety, making McDonald's share $490,000.

13

## FIRST COUNT:  EQUITABLE TOLLING

78.     Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 77.

79.     At all times during the events related herein, Mr. McDonald was advised by and relied upon the advice of his attorney, Defendant Reiss, in regard to the signing of the purported transfers of the Copyright from McDonald to Res Ipsa and from Res Ipsa to RP LLC, to McDonald's detriment.  Defendant Reiss repeatedly assured McDonald that the documents had no real significance, that they were being held "in escrow," and that McDonald still owned the copyright.  Therefore, that is what McDonald believed and continued to state to the production crew in New Orleans.

80.     As late as December 2010, when McDonald told Defendant Reiss that he was thinking of getting another lawyer, Defendant Reiss assured McDonald that he still represented McDonald and was looking after McDonald's best interests.  Thus McDonald was intentionally misled by his own attorney as to the status of the Screenplay and the Copyright and prevented from due diligence.

81.     The fact is that Defendants Reiss and Brown had sometime previously filed the purported transfer documents with the Copyright Office, even while assuring McDonald that exactly the opposite was true.  Therefore, McDonald is entitled to equitable tolling of any allegedly applicable statutes of limitations in regard to both the state law and federal claims and issues raised herein.

## SECOND COUNT:  CONSTRUCTIVE TRUST

82.     Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 81.

14

83.     Pursuant to the RP LLC Agreement, of which Defendant Brown, as a principal of Cine Globe and as manager of RP LLC, was a fiduciary, McDonald is entitled to proceeds of the Film, in consideration of which McDonald was advised by Defendant Reiss to surrender his rights to the Screenplay and ownership of the Copyright and to perform directorial and production services for the Film.

84.     However, Defendants Brown, RP LLC and Cine Globe transferred the Film to Defendant Conigliaro in the Conigliaro Settlement (upon information and belief, pursuant to the advice of Defendant Reiss) without any provision for McDonald's pecuniary or artistic rights thereto.  By this means Brown and Cine Globe were unjustly enriched.

85.     Therefore, McDonald seeks that a constructive trust be placed on the proceeds of the Film.

## THIRD COUNT: FRAUD – DEFENDANT REISS

86.     Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 85.

87.     McDonald engaged Defendant Reiss as an attorney to represent him as writer of the Screenplay, director of the Film and co-producer of the Film.

88.     In the course of this representation, Reiss willfully made fraudulent statements to McDonald regarding the financing of the Film, the casting of the Film, the contents and significance of documents he counseled McDonald to sign, the status of McDonald's rights in the Screenplay and the 2006 Copyright (and the fact that he had filed another claim on the Screenplay), the money that would be paid to McDonald, the contracts for McDonald's benefit that would be drafted and executed but which never were, and Reiss's own duty and intentions in regard to McDonald.

15

89.     Reiss made these fraudulent statements to induce McDonald to surrender his rights to the Screenplay and the 2006 Copyright and to perform directorial and production services to the Film that would inure to the benefit of Reiss's other clients, specifically, Brown and Cine Globe.

90.     McDonald relied on these fraudulent statements to his detriment.

91.     As a result, McDonald was damaged.

### FOURTH COUNT: ATTORNEY NEGLIGENCE
### DEFENDANT REISS

92.     Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 91.

93.     McDonald engaged Defendant Reiss as an attorney to represent him as writer of the Screenplay, director of the Film and co-producer of the Film.

94.     Reiss made McDonald sign a waiver of conflict of interest in regard to Reiss's previous and ongoing representation of Defendants Brown and Cine Globe.  That waiver did not mean that Reiss could simply dispense with his duty to McDonald as a client and use him as a convenience to the interests of Defendants Brown and Cine Globe.

95.     However, that is what Reiss did.

96.     Reiss failed to exercise the appropriate standard of professional care in his representation of Mr. McDonald in issues including but not limited to misrepresentations regarding the financing of the Film, the casting of the Film, the contents and significance of documents Reiss counseled McDonald to sign, conversion of McDonald's rights in the Screenplay and the 2006 Copyright, the status of the 2006 Copyright, the filing of a copyright claim on the Screenplay, the money that would be paid to McDonald, the hypothetical contracts

for McDonald's benefit that would be drafted and executed but which never were, and Reiss's own duty to McDonald, among other things.

97.     Moreover, Reiss failed to draft documents protecting McDonald's interests in regard to option agreements, sale agreements, compensation, and screen credits (among other things); he advised McDonald to enter into agreements that inured to the benefit of his clients Brown and Cine Globe, and to McDonald's detriment; and he oversaw the settlement of the Conigliaro Complaint and the transfer of purported ownership of the Film and purported transfer of ownership of the Screenplay to Defendant Conigliaro even though those rights had been fraudulently obtained, and without ensuring that McDonald's interests were protected, among other things.

98.     As a direct result of Reiss's negligent acts, McDonald was damaged.

**FIFTH COUNT:  BREACH OF FIDUCIARY DUTY
DEFENDANTS CINE GLOBE AND BROWN**

99.     Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 98.

100.     As the manager of RP LLC and as principal of its majority member Cine Globe, Brown had a fiduciary duty to McDonald, as principal of Res Ipsa, the minority member of RP LLC.

101.     Brown and Cine Globe breached this duty by refusing to provide financials to McDonald/Res Ipsa, by appropriating and converting the Screenplay and the 2006 Copyright under false pretenses without compensation, by filing a copyright claim on the Screenplay without notifying McDonald, by failing to compensate McDonald for his work as director on the Film, by failing to ensure McDonald/Res Ipsa's proper credit as writer, director or co-producer,

by sabotaging McDonald's work on the Film and his relationship with the cast and crew, by misrepresenting the status of financing, by allowing his production crew to defame and harass McDonald, by collecting tax credit money from the State of Louisiana on the basis of the production of this Film and a line item of $175,000 for the writer and script development, which was never paid to McDonald, and then using the money for something else, and by transferring the Film and the Screenplay and the 2006 Copyright when he had no right to do so, among other things.

102.     Brown and Cine Globe acted in bad faith and breached their fiduciary duty throughout, and never had any real intention of completing the Film or properly compensating and crediting McDonald.

103.     As a result, McDonald was damaged.

<strong>SIXTH COUNT:  FRAUD<br>DEFENDANTS CINE GLOBE AND BROWN</strong>

104.     McDonald repeat and incorporates herein the allegations set forth in paragraphs 1 through 103.

105.     Defendant Brown willfully made fraudulent statements to McDonald  regarding the financing of the Film, the casting of the Film, and the status of the 2006 Copyright (and the fact that Brown and Reiss had filed another claim on the Screenplay).

106.     Brown made these fraudulent statements to induce McDonald to surrender the rights to the Screenplay and the 2006 Copyright and to perform other services to the Film that would inure to Brown's own benefit, including the $175,000 in writer/script development fees, $50,000 in director's fees, and $50,000 in lost opportunities.

107.     McDonald relied on these inducements to his detriment and was damaged.

**SEVENTH COUNT:  UNJUST ENRICHMENT**
**ALL DEFENDANTS**

108.     Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 107.

109.     Defendants were knowingly unjustly enriched by the benefits of McDonald's original authorship of the Screenplay and the 2006 copyright, as well as by his directorial and production services on the film, and by the money of McDonald's own that he spent on development, and by the opportunities that he lost while relying on Reiss's and Brown's false promises.

110.     Thus, McDonald is entitled to compensation, both guaranteed and contingent.

**EIGHTH COUNT: QUANTUM MERUIT**
**ALL DEFENDANTS**

111.     Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 110.

112.     For his sole authorship of the Screenplay, for his work on the Film as director and producer,  for the money of his own that he spent on development, and for the opportunities that he lost while relying on Reiss's and Brown's false promises, McDonald is entitled to compensation, both guaranteed and contingent, as well as his share of the value of the Conigliaro Settlement.

**NINTH COUNT: BREACH OF CONTRACT**
**DEFENDANTS BROWN AND CINE GLOBE**

113.     Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 112.

114.     For his sole authorship of the Screenplay, for his work on the Film as director McDonald is entitled to the agreed upon guaranteed and contingent compensation, including but not limited to 49% of the value of the Screenplay and the Film, which were converted as a condition of the Conigliaro Settlement.

**TENTH COUNT:  CONVERSION**

115.     Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 114.

116.     Defendants Reiss, Brown, Cine Globe and RP LLC fraudulently induced McDonald to enter into (a) the purported "purchase agreement" of the Screenplay from McDonald to Res Ipsa; (b) the purported assignment of the 2006 Copyright from McDonald to Res Ipsa; (c) the RP LLC Agreement; and (d) the purported assignment of the 2006 Copyright from Res Ipsa to RP LLC.

117.     These contracts were also without consideration to McDonald.

118.     In May 2007, Defendants Reiss, Brown and RP LLC fraudulently filed a copyright claim on the Screenplay.

119.     They then converted those fraudulently acquired rights by purportedly transferring them to Defendant Conigliaro, who, upon information and belief, was aware of the disputed issues thereto.

120.     Therefore, McDonald is entitled to return of his rights in the Screenplay and the 2006 Copyright.

**ELEVENTH COUNT:  DECLARATORY JUDGMENT**
**DEFENDANTS CONIGLIARO AND EAST LAKE**

20

121.   Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 120.

122.   McDonald seeks a declaratory judgment that he is entitled to screen and print advertising credit in regard to the Film as (a) writer of the Screenplay (in accordance with Writer's Guild of America requirements), (b) assistant director (in accordance with Director's Guild requirements), and (c) co-producer, on any print advertising and on any positive print of the Film in any format and in any market, and that all such screen and print advertising of the Film must contain such credit.

## TWELFTH COUNT: INJUNCTIVE RELIEF
## DEFENDANTS CONIGLIARO AND EAST LAKE

123.   Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 122.

124.   McDonald seeks a permanent injunction requiring that all print advertising and positive prints or copies of the Film that have already been distributed in any format in any market that do not contain the credit to which McDonald is entitled be removed from circulation and that only print advertising and positive prints or copies of the Film that contain the credit to which McDonald is entitled be permitted to be distributed in any format in any market.

## THIRTEENTH COUNT: RESCISSION

125.   Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 124.

126.   Defendants Reiss, Brown, Cine Globe and RP LLC fraudulently induced McDonald to enter into (a) the purported "purchase agreement" of the Screenplay from McDonald to Res Ipsa; (b) the purported assignment of the 2006 Copyright from McDonald to

21

Res Ipsa; (c) the RP LLC Agreement; and (d) the purported assignment of the 2006 Copyright from Res Ipsa to RP LLC.

127.    These contracts were also without consideration to McDonald.

128.    Defendants Reiss, Brown, Cine Globe and RP LLC fraudulently filed a copyright claim on the Screenplay.

129.    They then purported to transfer those fraudulently acquired rights to Defendant Conigliaro, who, upon information and belief, was aware of the disputed issues thereto.

130.    Based on lack of consideration and fraud, McDonald is therefore entitled to rescission of (a) the purported "purchase agreement" of the Screenplay from McDonald to Res Ipsa; (b) the purported assignment of the 2006 Copyright from McDonald to Res Ipsa; (c) the RP LLC Agreement; and (d) the purported assignment of the 2006 Copyright from Res Ipsa to RP LLC, as well as (e) vitiation of any later fraudulently filed copyright claims.

## FOURTEENTH COUNT: FEDERAL COPYRIGHT INFRINGEMENT
## ALL DEFENDANTS

131.    Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 130.

132.    Pursuant to 17 USCS §§ 106 and 501, as a result of Defendants' actions, both individually and in collusion, McDonald was defrauded of his rights in the 2006 Copyright, and thus his ability to reproduce, create derivative works from, distribute, perform or display the Screenplay.

133.    As a result, Defendants were knowingly unjustly enriched by the benefits of McDonald's original authorship of the Screenplay and the 2006 copyright.

134.    Thus, pursuant to 17 USCS § 504,  McDonald is entitled to damages.

**FIFTEENTH COUNT: FEDERAL COPYRIGHT INFRINGEMENT**
**DEFENDANTS CONIGLIARO AND EAST LAKE**

135.    Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 134.

136.    Defendants Brown, RP LLC and Cine Globe (with the assistance of Defendant Reiss), converted the 2006 Copyright and the Film by purportedly transferring them to Defendant Conigliaro who participated in the transfer with full knowledge that ownership of the 2006 Copyright was in dispute, and who then, upon information and belief, transferred the 2006 Copyright and the Film to Defendant East Lake.

137.    McDonald seeks a declaratory judgment that he is entitled to screen and print advertising credit in regard to the Film as (a) writer of the Screenplay (in accordance with Writer's Guild of America requirements), (b) assistant director (in accordance with Director's Guild requirements), and (c) co-producer, on any print advertising and on any positive print of the Film in any format and in any market, and that all such screen and print advertising of the Film must contain such credit.

138.    McDonald seeks a permanent injunction requiring that all print advertising and positive prints or copies of the Film that have already been distributed in any format in any market that do not contain the credit to which McDonald is entitled be removed from circulation and that only print advertising and positive prints or copies of the Film that contain the credit to which McDonald is entitled be permitted to be distributed in any format in any market.

**SIXTEENTH COUNT: ATTORNEYS' FEES, COSTS AND DISBURSEMENTS**

139.    McDonald repeats the allegations set forth in paragraphs 1 through 138 as if fully set forth herein.

140.     Pursuant to 17 U.S.C. § 505, McDonald is entitled to reasonable attorneys' fees, costs and disbursements incurred in relation to the events described herein.

**WHEREFORE,** McDonald demands judgment against Defendants as follows:

1.     On the First Count, equitable tolling of any alleged applicable statutes of limitation.

2.     On the Second Count, a constructive trust and accounting of all profits of the Film.

3.     On the Third Count, damages in the amount of $350,000.

4.     On the Fourth Count, damages in the amount of $350,000.

5.     On the Fifth Count, damages in the amount of $845,000.

6.     On the Sixth Count, damages in the amount of $845,000.

7.     On the Seventh Count, damages in the amount of $845,000, plus 10% of the gross profits of the Film.

8.     On the Eighth Count, damages in the amount of $845,000, plus 10% of the gross profits of the Film.

9.     On the Ninth Count, damages in the amount of $8450,000.

10.     On the Tenth Count, return of the 2006 Copyright and the Screenplay

11.     On the Eleventh Count, proper screen and print credit as discussed above.

12.     On the Twelfth Count, proper screen and print credit as discussed above.

13.     On the Thirteenth Count, rescission of the listed contracts, vitiation of Defendants' later copyright filings.

14.     On the Fourteenth Count, damages in the amount of $845,000 plus 10% of the gross profits of the Film.

24

15.     On the Fifteenth Count, attorney's fees, costs and disbursements in an amount believed to be not less than $75,000.

16.     And for such other and further relief as to this Court may seem just and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.


Dated: New York, New York
         November 15, 2012


                                    **LISA ORNEST, ESQ.**
                                    *Attorney for Plaintiff*


                                    Lisa Ornest, Esq.
                                    44 Wall Street, 12ᵗʰ Floor
                                    New York, N.Y. 10005
                                    212- 461-2339
                                    Lisa@OrnestLaw.com

25

**Exhibit A**

**Lisa Ornest**

---

**From:**       ILS System [voyager@sun21.loc.gov]
**Sent:**       Wednesday, November 14, 2012 8:04 PM
**To:**         lisa@ornestlaw.com
**Subject:**    Copyright catalog Left Anchored Title Search for remnants


Type of Work:     Dramatic Work and Music; or Choreography

Registration Number / Date:
          PAu003013591 / 2006-01-30

Title:          Remnants.

Notes:           Screenplay.

Copyright Claimant:
          Christopher McDonald, 1973-

Date of Creation:  2005

Copyright Note:    Cataloged from appl. only.

Names:          McDonald, Christopher, 1973-


================================================================================
=


+++++++++++++++++++++++++++++++++++++++++++
The Library of Congress
United States Copyright Office
101 Independence Ave., S.E.
Washington, D.C. 20559-6000
202-707-3000

**Exhibit B**

FOR SETTLEMENT PURPOSES ONLY

## SETTLEMENT AND TRANSFER AGREEMENT

This Settlement and Transfer Agreement (the "Agreement") is made this ____ day of June, 2011 between Thomas Conigliaro ("Conigliaro") and Steven Brown ("Brown"), James David Williams ("Williams"), Remnants Films LLC ("Remnants-Delaware"), Remnants Productions LLC ("Remnants-New York") and Legacy Film Crest, LLC ("Film Crest"). Conigliaro, Brown, Williams, Remnants-Delaware, Remnants-New York and Film Crest together shall be referred to collectively as the "Parties." Brown, Williams, Remnants-Delaware, Remnants-New York and Film Crest shall be referred to collectively as the "Settling Defendants."

WHEREAS, a dispute exists concerning the rights, title and interests in a motion picture entitled "Remnants," identified by the United States Copyright Office Registration Number PAu003116136 ("Remnants"); and

WHEREAS, a lawsuit was filed by Conigliaro against Brown, Williams, Remnants-Delaware, Remnants-New York, Film Crest, Zachary Reeves and Oak Porcelli in the Supreme Court of the State of New York, County of New York (the "Court"), Index. No. 651057/2011 (the "Litigation"), concerning the dispute; and

WHEREAS, the Parties now desire to settle the dispute between and among themselves;

NOW THEREFORE, in consideration of the mutual promises, covenants, representations, terms and conditions set forth herein, the sufficiency of which is hereby acknowledged by the Parties, it is agreed as follows:

1.   **Dismissal of the Litigation**

Contemporaneously with the execution of this Agreement, the Parties will execute a Stipulation of Discontinuance of the Litigation in the form attached hereto as Exhibit A (the



1

FOR SETTLEMENT PURPOSES ONLY

"Stipulation"). The Stipulation shall be with prejudice and without costs or attorney's fees. Conigliaro will file the Stipulation with the Clerk of Court where the Litigation is pending.

2. **Transfer of Rights**

(a)    Settling Defendants hereby irrevocably grant, transfer, assign and set over unto Conigliaro and his successors and assigns in perpetuity, throughout the universe and exclusively, all rights in and related to Remnants, including but not limited to intellectual property rights and physical rights, now known or hereafter devised, without the necessity of further documentation, including, without limitation, all investments, proceeds, profits, intellectual property, copyrights, plots, themes, titles, ideas, characters, characterizations, and any translations or versions thereof now existing or hereafter created, and all other rights and interests pertaining thereto to which the Settling Defendants have right, title or interest.

(b)    Conigliaro does not assume and is not responsible for any debts, liabilities, tax obligations, claims, liens, entitlements or encumbrances existing on the date of execution of this Agreement except those specifically set forth in Schedule A and Schedule B attached hereto, and only insofar as such obligations are specifically related to Remnants.

(c)    The parties will simultaneously execute the Assignment and Quitclaim Agreement attached hereto as Exhibit B. Conigliaro will file the Assignment and Quitclaim Agreement with the United States Copyright Office as a recordation of the transfer of rights detailed in this Agreement. Any such filing or failure to file does not affect the enforceability of the transfer of rights detailed in this Agreement.

(d)    Conigliaro is hereby empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any kind or nature under or concerning rights in and to Remnants, or with any of the rights hereby granted to Conigliaro.



2

FOR SETTLEMENT PURPOSES ONLY

(e)    The Settling Defendants warrant that they own all of the intellectual property rights to Remnants, no transfer of the intellectual property rights has previously been made, they have the legal right to transfer to Conigliaro the rights set out in this Agreement and that such transfer does not infringe any third parties' rights.

(f)    The Settling Defendants warrant that there are no pending lawsuits, actions, claims, liens or encumbrances pending or threatened concerning any aspect of the rights transferred herein other than the Litigation and that the copyrights transferred herein have not been published in such a way as to lose any of their copyright protection.

3.    **Indemnification**

(a)    The Settling Defendants agree to indemnify and hold Conigliaro, his successors and assigns harmless from and against all liability, damages, penalties, loss or expense, including reasonable attorney's fees, which may be suffered, incurred or assumed by Conigliaro by reason of a breach or failure of any of the Settling Defendants' warranties, covenants or agreements set forth in this Agreement, including but not limited to any debts, liabilities, tax obligations, claims, liens or encumbrances relating to Remnants and existing on the date of execution of this Agreement.

(b)    Conigliaro agrees to indemnify and hold the Settling Defendants and their successors and assigns harmless from and against all liability, damages, penalties, loss or expense, including reasonable attorney's fees, which may be suffered, incurred or assumed by the Settling Defendants by reason of a breach or failure of any of Conigliaro's warranties, covenants or agreements set forth in this Agreement.

3

FOR SETTLEMENT PURPOSES ONLY

4.  **Additional Documents**

The Settling Defendants agree expeditiously and to use best efforts to execute, acknowledge and deliver to Conigliaro and to procure the execution, acknowledgment and delivery to Conigliaro of any additional documents or instruments consistent with this Agreement which Conigliaro may require to fully effectuate and carry out the intent and purposes of this Agreement.

5.  **Non-Disparagement**

(a)  The Parties agree not to make any statements, written or verbal, or cause or encourage others to make any statements, written or verbal, that defame, disparage or in any way criticize the personal or business reputation, practices, or conduct of the Parties, their employees, directors, and officers.

(b)  The Settling Defendants agree not to make any statements, written or verbal, or cause or encourage others to make any statements, written or verbal, that defame, disparage or in any way criticize Remnants.

(c)  The Parties acknowledge and agree that these prohibitions extend to statements, written or verbal, made to anyone, including but not limited to, the news media, investors, potential investors, any board of directors or advisory board or directors, industry analysts, competitors, strategic partners, vendors, employees (past and present), and clients.

(d)  The Parties understand and agree that this Section is a material provision of this Agreement and that any breach of this Section shall be a material breach of this Agreement, and that each Party would be irreparably harmed by violation of this provision.

6.  **Breach of the Obligations of this Agreement**

Prior to exercising any rights or remedies arising under this Agreement due to a Party's



4

FOR SETTLEMENT PURPOSES ONLY

material breach of this Agreement, the Party asserting that a material breach has occurred shall give written notice, pursuant to Section 13 of this Agreement, to the party it claims to have caused the material breach of this Agreement. Following receipt of said notice, the Party alleged to have caused the material breach shall have ten (10) days to cure said breach.

If, following that ten-day period, the breach has not been cured, then the Party claiming that a breach has occurred shall have the right, *inter alia*, to pursue all of its rights and remedies against the breaching party under this Agreement.

7.   **Arbitration**

In the event of a dispute between the Parties arising out of or concerning this Agreement, such dispute shall be settled by arbitration in accordance with the rules for commercial arbitration of the American Arbitration Association in effect at the time such arbitration is initiated. Such arbitration shall be adjudicated by a three-person Panel and shall take place in New York City. The decision of the Arbitration Panel shall be final and binding upon all Parties.

The prevailing Party shall be awarded all of the filing fees and related administrative costs. Administrative and other costs of enforcing an arbitration award, including the costs of subpoenas, depositions, transcripts and the like, witness fees, payment of reasonable attorney's fees, and similar costs related to collecting an arbitrator's award, will be added to, and become a part of, the amount due pursuant to this Agreement.

8.   **Injunctive Relief Appropriate**

The Parties recognize and acknowledge that, without waiving any right to collect damages or obtain any other relief, it may be difficult depending upon the nature of a particular dispute to determine or fix the amount of damages that would be sustained as a result of a breach of this Agreement by any of the Parties. Accordingly, the Parties agree that, in the event of any

5

breach of this Agreement, the non-breaching Party would suffer irreparable harm and that the entry of injunctive relief would be appropriate. The Parties agree that the breaching Party will not oppose the entry of injunctive relief upon the finding of a court where equitable relief can be sought, notwithstanding Section 7 above, of a violation of this Agreement. The Parties further agree that monetary damages alone are not a sufficient remedy for violation of this Agreement.

9.   **Representations and Warranties**

(a)   Each of the Parties hereby represents and warrants as follows:

(i)   <u>Due Authorization</u>. Each of the Parties has all requisite power and authority to execute, deliver and perform this Agreement, including, but not limited to, the releases contained in Section 11, and no consent or approvals of any other party is needed in connection herewith; and

(ii)   <u>Binding Effect</u>. Upon the full execution and delivery of this Agreement by each of the Parties, this Agreement shall be the legal, valid and binding obligations of each of the Parties, enforceable against each Party in accordance with its terms.

10.   **Tax Consequences**

Each of the Parties agrees that he, she or it is solely responsible for all tax obligations and liabilities, if any, that relate to or arise out of the terms of this Agreement and that exist or may exist relating to Remnants prior to execution of this Agreement or relate to or is a result of actions taken prior to execution of this Agreement.

11.   **Release**

In consideration of the foregoing, the Parties hereby fully and finally release and discharge each other for and from any and all claims, counterclaims, demands, causes of action, liabilities, obligations, damages, costs, expenses, and any form of relief of whatever kind or

6



FOR SETTLEMENT PURPOSES ONLY

nature, whether known or unknown, whether accrued or yet to accrue, whether in law or equity, that have been or could have been or are required to have been asserted in the Litigation and all claims and counterclaims arising from or relating to the Litigation.

### 12.   **Right to Counsel**

The Parties represent that they fully understand their right to discuss all aspects of this Agreement with an attorney of their choice.  The parties represent that they have carefully reviewed and fully understand all provisions of this Agreement and that they are voluntarily entering into this Agreement.

### 13.   **Miscellaneous**

(a)   Notices.

All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be delivered personally, via facsimile transmission (with receipt confirmed) or electronic mail (with receipt confirmed), by a recognized international courier service (with receipt confirmed), or by registered or certified mail, postage prepaid, in each case to the Parties at the addresses and telecopy numbers set forth below (or to such other addresses and telecopy numbers as a Party may have specified by notice given to the other Parties pursuant to this Section 13).  Any notice that is addressed and mailed in the manner herein provided shall be deemed to have been duly given.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.  The following international delivery services shall be deemed to be "recognized" for the purposes of this Agreement:  DHL, Federal Express, United Parcel Service, Seur and Airborne Express.



FOR SETTLEMENT PURPOSES ONLY

If to Conigliaro:
Peter R. Ginsberg
Ginsberg & Burgos, PLLC
12 East 49th Street
New York, New York 10022
(646) 374-0029 (phone)
(646) 355-0202 (facsimile)

If to Settling Defendants:
Barry Jay Reiss
Five Penn Plaza, 19th Floor
New York, New York 10001
(646) 248-6219 (phone)
(212) 849-6816 (facsimile)

(b)   Assignment; Successors; Third Party Beneficiaries.

This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

(c)   Entire Agreement; Amendment; Waiver; Captions.

This Agreement constitutes the entire agreement, and supersedes all prior and contemporaneous agreements or understandings, whether written or oral, among the Parties with respect to the subject matter hereof.  This Agreement may be amended only by a written instrument executed by each of the Parties.  No waiver of any provision of this Agreement shall be effective unless made in writing and signed by an authorized representative of the waiving Party.  No waiver of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof.

(d)   Governing Law.

This Agreement shall be construed under, governed by, and enforced in accordance with the laws of the State of New York, applied without regard to choice-of-law rules.

8



FOR SETTLEMENT PURPOSES ONLY

(e)    Severability.

To the fullest extent that they may effectively do so under applicable law, the Parties hereby waive any provision of law which renders any provision of this Agreement invalid, illegal or unenforceable in any respect.  The Parties further agree that any provision of this Agreement, which, notwithstanding the preceding sentence, is rendered or held invalid, illegal or unenforceable in any respect in any jurisdiction shall be ineffective, but such ineffectiveness shall not render invalid, illegal or unenforceable this Agreement or any of the remaining provisions of this Agreement.

(f)    Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  For ease of administration, this Agreement may be executed by facsimile or scanned signatures on counterparts.  When all such signatures have been collected, this Agreement shall be final and binding.

(g)    No Admission.  Nothing in this Agreement may be used or construed by any person or entity as an admission of liability by any Party.

(h)    Headings.  The headings in this Agreement are for reference purposes only, do not constitute a part of this Agreement, and shall not affect its meaning or interpretation.

IN WITNESS WHEREOF, the Parties have each executed this Agreement as of the date(s) indicated below.

Thomas Conigliaro

Dated: 6/21/11

9

FOR SETTLEMENT PURPOSES ONLY

Steven Brown, Individually

Dated: 6-20-11

Steven Brown, Manager, Remnants
Films LLC

Dated: 6-20-11

Steven Brown, Manager, Remnants
Productions LLC

Dated: 6-20-11

_____
James David Williams, Individually

Dated: _____

_____
James David Williams, President,
Legacy Film Crest, LLC

Dated: _____

10

FOR SETTLEMENT PURPOSES ONLY

_____
Steven Brown, Individually

Dated: _____


_____
Steven Brown, Manager, Remnants
Films LLC

Dated: _____


_____
Steven Brown, Manager, Remnants
Productions LLC

Dated: _____


_____
James David Williams, Individually

Dated: June 21, 2011


_____
James David Williams, President,
Legacy Film Crest, LLC

Dated: June 21, 2011

10

FOR SETTLEMENT PURPOSES ONLY

## SCHEDULE A: ENTITLED ACTORS

Conigliaro acknowledges that certain Remnants actors (the "Entitled Actors") claim or may claim an interest in certain residuals pursuant to the terms and conditions of contracts with Remnants-New York, and, insofar as those claims are specifically related to Remnants and the Entitled Actors can provide legally sufficient documentation supported by valid consideration and executed in the ordinary course of Remnants-New York's business establishing those claims, Conigliaro agrees to satisfy those obligations from the net profits resulting from the distribution of Remnants following payment in the ordinary course of obligations due and owing to, *inter alia*, investors in Remnants and reimbursement of the cost of the Litigation.  The Entitled Actors are limited to the following:

    (a)    Monica Keena;

    (b)    Eddie Furlong; and

    (c)    Andre Royo.

FOR SETTLEMENT PURPOSES ONLY

## SCHEDULE B: INVESTORS

Conigliaro acknowledges that certain persons claim an equity interest in Remnants pursuant to the terms and conditions of contracts with Remnants-New York, and, insofar as those claims are specifically related to Remnants and such persons can provide legally sufficient documentation supported by valid consideration and executed in the ordinary course of Remnants-New York's business establishing those claims, Conigliaro agrees to satisfy those obligations from the net profits resulting from the distribution of Remnants in the ordinary course of obligations due and owing to investors in Remnants who, upon proof of such rights, will receive payment in *pari passu* with other investors similarly entitled following repayment of the cost of the Litigation.  Such persons are limited to the following:

    (a) Mark Yeh (subject to a maximum entitlement of $184,400.00); and

    (b) Peter Evans (subject to a maximum entitlement of $100,000.000).

Initial_____                                          Initial____

FOR SETTLEMENT PURPOSES ONLY

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THOMAS CONIGLIARO,

          Plaintiff,               Index No.651057/2011

        v.                   **STIPULATION OF**
                            **DISCONTINUANCE**
STEVEN BROWN, JAMES DAVID WILLIAMS,
REMNANTS FILMS LLC, REMNANTS
PRODUCTIONS LLC, LEGACY FILM CREST,
LLC, ZACHARY REEVES, and OAK PORCELLI,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto pursuant to CPLR 3217(a)(2), that:

WHEREAS no party to this action is an infant or a conservatee for whom a committee has been appointed, and no person not a party has an interest in the subject matter of this action;

IT IS THEREFORE AGREED THAT:

This action and all claims or rights of action against Defendants Steven Brown, James David Williams, Remnants Films LLC, Remnants Productions LLC, and Legacy Film Crest, LLC arising therefrom be and hereby are discontinued with prejudice and without costs or disbursements in favor of either party against another; and

IT IS FURTHER AGREED that this stipulation may be filed without further notice with the Clerk of the Court, Supreme Court, New York County; and

IT IS FURTHER AGREED that this Stipulation may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. For ease of administration, this Stipulation may be executed by

13



**FOR SETTLEMENT PURPOSES ONLY**

facsimile or scanned signatures on counterparts.  When all such signatures have been collected,
this stipulation shall be final and binding.

Thomas Conigliaro

Dated: 6/21/11

Steven Brown, Individually

Dated: 6-20-11

Steven Brown, Manager, Remnants
Films LLC

Dated: 6-20-11

Steven Brown, Manager, Remnants
Productions LLC

Dated: 6-2-11

_____
James David Williams, Individually

Dated: _____

_____
James David Williams, President,
Legacy Film Crest, LLC

Dated: _____

14

Dated: _____

_____
Steven Brown, Individually

Dated: _____

_____
Steven Brown, Manager, Remnants
Films LLC

Dated: _____

_____
Steven Brown, Manager, Remnants
Productions LLC

Dated: _____

_____
James David Williams, Individually

Dated: June 21, 2011

_____
James David Williams, President,
Legacy Film Crest, LLC

Dated: June 21, 2011

14

**FOR SETTLEMENT PURPOSES ONLY**

## EXHIBIT B

### ASSIGNMENT AND QUITCLAIM AGREEMENT

For good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), Remnants Productions LLC, on its own behalf and on behalf of each of its past, present and future predecessors-in-interest, successors-in-interest, representatives, agents, managers, partners, members, joint venturers, heirs, executors, administrators, attorneys, assigns, parents, subsidiaries, affiliates, officers, directors, shareholders and licensees (collectively, the "Assignors") hereby exclusively and perpetually quitclaim, relinquish and irrevocably assign and convey to Thomas Conigliaro and his successors, licensees, and assigns any and all of the Assignors' past, present, or future copyright ownership, co-ownership, title, or interest (and all renewals and extensions thereof), or any other claim of ownership, right or interest (and all renewals and extensions thereof), or any other claim of ownership, right or interest in or to the motion picture Remnants, identified by the United States Copyright Office Registration Number PAu003116136. For the avoidance of doubt, this Assignment and Quitclaim Agreement assigns to Thomas Conigliaro, without limitation, any and all right, title and interest worldwide to all copyrights in Remnants and all other rights in Remnants (including without limitation economic rights and moral rights) now in existence or later created (including without limitation renewals and extensions thereof) throughout the universe in perpetuity, for use in any and all media now in existence or later discovered, without the necessity of any future consideration or payment of royalties. This assignment of all copyrights, rights under copyright and moral rights in Remnants is not terminable or subject to reversion.

As part of this Assignment and Quitclaim Agreement, the Assignors hereby exclusively and irrevocably assign, transfer and convey to Thomas Conigliaro in perpetuity any and all registrations for Remnants which the Assignors have obtained from the United States Copyright Office and any and all foreign copyright registrations for Remnants.

_____
Thomas Conigliaro

Dated: 6/21/11

_____
Steven Brown, Manager, Remnants Productions LLC

Dated: 6-2-2-11

15

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CHRISTIAN McDONALD,

                                                Plaintiff,

   -against-


BARRY JAY REISS ESQ., STEVEN BROWN,
REMNANTS PRODUCTIONS LLC, CINE GLOBE PRODUCTIONS LLC,
EAST LAKE FILMS LLC and THOMAS V. CONIGLIARO,

                                                Defendants.

---

AMENDED COMPLAINT

---

**Lisa Ornest**
Attorney at Law
*Attorney for Plaintiff*
44 Wall Street, 12th Floor
New York, New York 10005
T:  212-461-2339
F:  646-607-4156

---

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of the State of New York, certifies that, upon information and belief and reasonable inquiry, the contents contained in the annexed documents are not frivolous.

_____11/15/12_____                     _____
Dated                                                    Lisa Ornest, Esq.

---

To:

---

Service of a copy of the within                     is hereby admitted.

Dated:  _____

_____